# EXHIBIT
# 5

EXHIBIT
5

# Dobronski v. Rocket Mortg., LLC

United States District Court for the Eastern District of Michigan, Southern Division

July 15, 2026, Decided; July 15, 2026, Filed

Case No. 4:25-cv-12798

**Reporter**
2026 U.S. Dist. LEXIS 180350 *; 2026 LX 479174

MARK W. DOBRONSKI, Plaintiff, v. ROCKET MORTGAGE, LLC, Defendant.

**Subsequent History:** Adopted by, Motion denied by, Without prejudice, Motion denied by, As moot, Objection overruled by, Without prejudice *Dobronski v. Rocket Mortg., LLC, 2026 U.S. Dist. LEXIS 178153, 2026 WL 2296669 (Aug. 10, 2026)*

**Counsel:** **[*1]** For Mark W. Dobronski, Plaintiff: Mark W Dobronski, Dexter, MI.

For Rocket Mortgage, LLC, Defendant: Jeffrey M. Thomson, Morganroth & Morganroth, PLLC, Birmingham, MI; William Kyle Tayman, Goodwin Procter LLP, Washington, DC.

**Judges:** KIMBERLY G. ALTMAN, United States Magistrate Judge. District Judge F. Kay Behm.

**Opinion by:** KIMBERLY G. ALTMAN

## Opinion

**REPORT AND RECOMMENDATION ON DEFENDANT'S DISPOSITIVE MOTIONS (ECF Nos. 10, 11, 19) AND ORDER GRANTING DEFENDANT'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY (ECF No. 18)**[1]

I. Introduction

This is a consumer rights case under the *Telephone Consumer Protection Act of 1991 (TCPA), 47 U.S.C. § 227 et seq*, the *Michigan Home Solicitation Sales Act (MHSSA), M.C.L. § 445.101, et seq.*, and the *Michigan Telephone Companies as Common Carriers Act (MTCCCA), M.C.L. § 484.101, et seq.*. Plaintiff Mark W. Dobronski, proceeding *pro se*, is suing Rocket Mortgage, LLC (Rocket) for unauthorized phone calls and text messages allegedly sent to him by Rocket in violation of the cited acts. (ECF No. 14, First Amended Complaint).

Before the Court are Rocket's motion to compel arbitration (ECF No. 10), motion to dismiss the original complaint (ECF No. 11), and motion to dismiss the amended complaint (ECF No. 19). Also before the Court is Rocket's motion for leave to file supplemental authority relating to its second motion to dismiss (ECF No. 18), which the undersigned will grant and consider below.

The motions are fully **[*2]** briefed and ready for consideration. For the reasons that follow, the undersigned RECOMMENDS that Rocket's motion to compel arbitration be DENIED WITHOUT PREJUDICE, that its first motion to dismiss the complaint be DENIED AS MOOT, and that its second motion to dismiss the complaint be GRANTED IN PART and DENIED IN PART. If these recommendations are adopted, Counts I, II, V, VI, and VII would be dismissed as to calls 1 through 20, but all other claims would remain.

II. Background

A. Allegations

The following allegations are taken from the First Amended Complaint, and they must be assumed true on a motion to dismiss. *CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1262 (6th Cir. 1996)*.

Dobronski alleges that from August 11 to 19, 2025, he received twenty uninvited phone calls from the same number to his cellular telephone number 734-***-*212. (ECF No. 14, PageID.163-164). For each of these first twenty calls, the inbound call rang only once and then "immediately terminated before [Dobronski] could answer the telephone." (*Id.*).

Dobronski says that he subsequently called the telephone number from the caller ID of these calls and

[1] Upon review of the motions, the undersigned deems these matters appropriate for decision without oral argument. *See Fed. R. Civ. P. 78(b)*; *E.D. Mich. LR 7.1(f)(1)*.

received a recorded message identifying Rocket as the call recipient. The message instructed the caller to press "1," "2," or "3" **[*3]** to speak to a live agent. Dobronski pressed 1 and was connected with an agent named Blake. Dobronski asked Blake why he had received phone calls from this number and Blake explained that Rocket had been attempting to contact him to discuss his interest in mortgage refinancing. Dobronski explained to Blake that his telephone number was on the National Do Not Call Registry and that he was not interested in mortgage refinancing, and asked that Rocket not call his telephone number again. (*Id.*).

Then, on September 29, 2025, Dobronski was awoken by a call from a different, toll-free number that he ultimately discovered was from Rocket or its agent. (*Id.*, PageID.165). Dobronski answered this call and was greeted by a robotic voice that was mid-sentence, inviting him to talk to licensed specialist "George Rasmus" about obtaining a home loan. Rasmus did not identify himself as affiliated with Rocket until Dobronski asked who he was calling on behalf of, and Rasmus explained that Dobronski was receiving this call because of an online inquiry that Dobronski made under the name "Test Testing." (*Id.*).

Dobronski informed Rasmus that he did not fill out any online inquiry, was not looking to purchase **[*4]** a home, and that his number was listed on the National Do Not Call Registry. He complained about receiving the call and recorded message, and Rasmus responded that calls were made by an "AI integrated, automated system." Dobronski requested Rocket's written do-not-call policy, which Rasmus could not provide. Rasmus was also unable to provide Rocket's address and then forwarded the call to the "client relations team." After being placed on hold, Dobronski was connected to "Marquita with Rocket Mortgage." (*Id.*, PageID.166). Marquita told Dobronski she would ensure that his phone number was opted out of Rocket's system but could not provide him with a written do-not-call policy. She transferred Dobronski to the escalations team after Dobronski asked what evidence Rocket had of him providing prior express written consent for the automated call to his number. (*Id.*).

After being placed on hold again, Dobronski was connected to "Alicia Flores." Flores informed Dobronski that his number had been removed, but not opted out, on August 20, and that his number was "surfed back up to see if maybe someone else [could] reach out to see if [he] might still be interested" in obtaining a home loan. ( **[*5]** *Id.*, PageID.168). Dobronski asked again for a written do-not-call policy, and Flores told him she would have to look into the matter. As of the date of the amended complaint, Dobronski has not been provided with a copy. (*Id.*, PageID.167-168).

About two minutes after Dobronski had initially answered this call, and while he was talking to Rasmus, Dobronski received a SMS text message from Rocket that read: "Hi Testq, it's George Rasmus from Rocket Mortgage. Here is my contact information, which you can open and easily save into your phone to have on hand whenever you need! NMLS #1639092. Reply STOP to opt out." (*Id.*, PageID.168).

Based on these unsolicited calls and text message, Dobronski asserts twelve claims based on TCPA violations under *47 C.F.R. § 64.1200(a)*, *(c)*, and *(d)* and *47 C.F.R. § 64.1601(e)*; one MHSSA violation; and one MTCCCA violation. (*Id.*, PageID.169-176). His total prayer for relief, encompassing 173 alleged TCPA violations, 22 MHSSA violations, and 2 MTCCCA violations, is $267,000.00. (*Id.*, PageID.176-177).

B. Procedural History

On September 5, 2025, Dobronski filed his original complaint. (ECF No. 1). Rocket appeared in the case on November 10, 2025, and filed a motion to compel arbitration (ECF No. 10) and a motion **[*6]** to dismiss (ECF No. 11). In response to the motion to dismiss, Dobronski filed an amended complaint on November 24, 2025, which currently governs the case. (ECF No. 14). Rocket then filed a motion to dismiss the amended complaint on December 22, 2025. (ECF No. 19). The motion to compel arbitration and second motion to dismiss are fully briefed. (ECF Nos. 13, 15, 21, 23). Each party has also filed supplemental information or authority, which will be considered. (ECF Nos. 18-1, 24).

III. Legal Standard

Rocket has moved to dismiss the case for violation of an agreement to arbitrate, or alternatively, to allow limited discovery on the issue. (ECF No. 10). In the event this motion is not granted, Rocket has also moved to dismiss the complaint for failure to state a claim. (ECF No. 19). Both motions are analyzed under *Federal Rule of Civil Procedure 12(b)(6)*. *See, e.g., Mad Mobile, Inc. v. Meijer Great Lakes Ltd. P'ship, 702 F. Supp. 3d 620, 624 (W.D. Mich. 2023)* (citing *Barnabo v. Edward D. Jones & Co., LP, No. 2:23-cv-09, 2023 U.S. Dist. LEXIS 58631, 2023 WL 2730218, at *1 (W.D. Mich. Feb. 28, 2023)* (collecting cases)).

When deciding a motion to dismiss under Rule 12(b)(6), the Court must "construe the complaint in the light most favorable to plaintiff and accept all allegations as true." Keys v. Humana, Inc., 684 F.3d 605, 608 (6th Cir. 2012); *JPMorgan Chase Bank, N.A. v. Winget, 510 F.3d 577, 582 (6th Cir. 2007)*. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (internal **[*7]** quotation omitted); *see also* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (concluding that a plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action").

Facial plausibility is established "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted). "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." 16630 Southfield Ltd., P'Ship v. Flagstar Bank, F.S.B., 727 F.3d 502, 503 (6th Cir. 2013).

Furthermore, the Court holds *pro se* complaints to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972). However, even in pleadings drafted by *pro se* parties, "'courts should not have to guess at the nature of the claim asserted.'" Frengler v. Gen. Motors, 482 F. App'x 975, 976-977 (6th Cir. 2012) (quoting Wells v. Brown, 891 F.2d 591, 594 (6th Cir. 1989)). Moreover, "courts may not rewrite a complaint to include claims that were never presented . . . nor may courts construct the Plaintiff's legal arguments for him. . . . [N]either may the Court 'conjure up unpled allegations.'" *Rogers v. Detroit Police Dep't, 595 F. Supp. 2d 757, 766 (E.D. Mich. 2009)*.

IV. Discussion

A. Motion to Compel Arbitration

Section 2 of the FAA provides that a contractual agreement "to settle by **[*8]** arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4." 9 U.S.C. § 2. The overarching purpose of arbitration is the avoidance of litigation. *Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp., 274 F.2d 805, 808 (2d Cir. 1960)*. When considering a motion to compel arbitration, "the Court [] 'must determine whether the dispute is arbitrable, meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of the agreement.'" *Jones-Bey v. JPay Inc.*, No. 2:17-cv-12545, 2019 WL 6337770, at *2 (E.D. Mich. Oct. 10, 2019) (quoting Landis v. Pinnacle Eye Care, LLC, 537 F.3d 559, 561 (6th Cir. 2008)), *report and recommendation adopted*, 2019 WL 6329666 (E.D. Mich. Nov. 26, 2019). "The burden is on the party opposing arbitration to show that the agreement is not enforceable." Blanton v. Domino's Pizza Franchising LLC, No. 18-13207, 2019 U.S. Dist. LEXIS 184817, 2019 WL 5543027, at *1 (E.D. Mich. Oct. 25, 2019), *aff'd, 962 F.3d 842 (6th Cir. 2020)*.

In ruling on motions to compel arbitration, "courts routinely look to evidence outside of the pleadings." Mylocker.com, LLC v. S&S Activewear, LLC, No. 25-CV-10160, 2025 U.S. Dist. LEXIS 154560, 2025 WL 2350653, at *3 (E.D. Mich. Aug. 12, 2025) (citing Great Earth Companies, Inc. v. Simons, 288 F.3d 878, 889 (6th Cir. 2002)). Here, Rocket has submitted a Declaration from Amy Courtney, Principal Data Analyst at Rocket, LP, the parent of and service provider to Rocket Mortgage, LLC. (ECF No. 10-2). According to her personal knowledge and records she reviewed, an individual from the IP address 173.167.231.105 visited a Rocket website on or about August 11, 2025, **[*9]** and made a voluntary submission as part of an online request for mortgage information. (*Id.*, PageID.69). She says that according to the online databases, such as whatismyipaddress.com, this IP address traces to Ann Arbor, Michigan. (*Id.*); *see* https://whatismyipaddress.com/ip/173.167.231.105 (last visited July 6, 2026). Rocket's business records show that on August 11, this IP address user entered the following information as part of their submission for mortgage information:

a) Name: Testq Testing

b) Phone Number: 734-***-*212

c) Property State: MI

d) Loan Purpose: Purchase

e) Loan Amount: 250,000

(*Id.*).

This user then clicked "Confirm & continue." (*Id.*, PageID.70). Above the "Confirm & continue" button, there is a notice that by clicking the button, one agrees to Rocket's Privacy Policy and Terms of Use, both of which are clickable links. (*Id.*). The notice warns users that the Terms of Use includes an "agreement to arbitrate claims related to the Telephone Consumer Protection Act." (*Id.*). It also says that by clicking, the user expressly consents to receive sales, marketing, and other calls and texts, including those sent by an automated system or other means for selecting and dialing telephone numbers, or using an artificial **[*10]** or prerecorded voice message when a connection is completed from Rocket, even if the telephone number entered is on a do-not-call list. (*Id.*). If someone opened the Terms of Use link on that page, they would see that the Terms of Use include an agreement to arbitrate any claims, disputes, or controversies related to the TCPA "or any similar state laws" between the user and Rocket, governed by the Federal Arbitration Act (FAA). (*Id.*, PageID.71).

In Rocket's motion for leave to file supplemental authority, it submits evidence that after the filing of this lawsuit, on September 29, 2025, someone navigated to another Rocket website and entered another mortgage information request from the same name, phone number, and state as before. (ECF Nos. 18, 18-1). This request came from a different IP address, 97.156.89.19, which the IP tracking website indicates originated from Southfield, Michigan. *See* https://whatismyipaddress.com/ip/97.156.89.19 (last visited July 6, 2026). Despite the difference in IP addresses, Courtney indicates in her supplemental declaration—without explanation—that Rocket's "systems of record indicated that the September 29, 2025 submission from telephone user 734-XXXX212 originated from the same individual **[*11]** as the August 11 Submission." (ECF No. 18-1, PageID.212).

In response, Dobronski does not argue that the agreement is generally unenforceable or that it would not cover the scope of his claims. He simply argues, supported by his own sworn declaration, that he did not at any time visit the Rocket websites in question or enter the information noted above in order to receive mortgage information from Rocket. (ECF No. 13). In addition to his sworn statement that he did not personally agree to be bound by Rocket's Terms of Use because he did not visit the websites or click "Confirm & continue" in order to be bound by the agreement, Dobronski notes that the IP address of the original user that agreed to receive mortgage information on August 11 is listed on https://whatismyipaddress.com/ip/173.167.231.105 as being a Comcast user from the "Humane Society" in Ann Arbor, Michigan. Dobronski attests that he has never had access to that IP address, does not have a residence in Ann Arbor,[2] and does not have Comcast as an internet provider at any of his residences. (*Id.*, PageID.140).

Rocket argues that Dobronski's "self-serving declaration[] cannot create a dispute of fact to avoid arbitration." (ECF **[*12]** No. 15, PageID.183) (citing *Mullen v. Chaac Pizza Midwest, LLC, No. 1:20-cv-893, 2022 U.S. Dist. LEXIS 39301, 2022 WL 673187, at *5 (S.D. Ohio Mar. 7, 2022)*; *Anderson v. Crothall Healthcare Inc., No. 2:21-CV-10535, 2022 U.S. Dist. LEXIS 155053, 2022 WL 3719834, at *4-5 (E.D. Mich. Aug. 29, 2022)*; *Jordan v. Comcast Cable Commc'ns Mgmt., LLC*, No. 1:14-cv-3622- WSD, 2016 WL 452145, at *6 (N.D. Ga. Feb. 4, 2016)).

The undersigned is not persuaded that Rocket has shown enough to compel arbitration, nor that Dobronski's assertions are unsupported. Rocket has shown that someone has entered the phone number at issue in this case into its database on two occasions, subjecting whoever that was to an agreement to arbitrate TCPA and similar claims. But Rocket's own evidence indicates that these two requests were likely made from a Comcast IP address at the Humane Society in Ann Arbor, Michigan, and a Verizon Business IP address in Southfield, Michigan. Dobronski has not addressed the latter, as he opposed Rocket's motion for leave to provide supplemental information on other grounds, but he has attested that he does not have access to the former IP address, does not have a residence in Ann Arbor, and does not use Comcast internet. These are not merely bald, unsupported denials; they are factual and falsifiable assertions. There is no evidence provided by Rocket that the individual who submitted these inquiries—and agreed to arbitrate their TCPA claims—is anyone other than a person who knows Dobronski's telephone number or has mistyped their own.[3]

---

[2] Dobronski says that his nearest residence to Ann Arbor is located in Lima Township, Washtenaw County, Michigan. (ECF No. 13, PageID.140).

[3] The undersigned notes that Rocket could easily avoid the issue by implementing two-factor authentication to verify that the information request was made by the owner of the telephone number entered into the form.

Rocket argues that the **[*13]** Court should assume the form was submitted by Dobronski or someone on his behalf because "[t]here is no obvious benefit to anyone else submitting a lead with a fake name and phone number that did not belong to them." (ECF No. 10, PageID.59) (citing *Uszak v. AT & T, Inc., No. 1:14CV2800, 2015 U.S. Dist. LEXIS 194986, 2015 WL 13037500, at *6 (N.D. Ohio Oct. 6, 2015)*, *aff'd sub nom. Uszak v. AT & T Mobility Servs. LLC, 658 F. App'x 758 (6th Cir. 2016)*). In *Uszak*, the plaintiff alleged that he was not informed of his employer, AT&T's, arbitration program or his ability to opt out from it. *2015 U.S. Dist. LEXIS 194986, [WL] at *2*. However, in that case, the plaintiff received three emails entitled "Action Required: Arbitration Agreement" and after the third email, "someone logged in under Uszak's unique AT&T email and password, accessed the 'Management Arbitration Agreement'" and "clicked the 'Review Complete' button." *Id.* The plaintiff argued that someone else must have logged into his password-protected computer, accessed his emails, and clicked the button without opting out of the agreement, but the *Uszak* court did not buy the story, compelling arbitration and dismissing the case. *2015 U.S. Dist. LEXIS 194986, [WL] at *6-7*. Although the *Uszak* court stated that "[t]here was no benefit to any employee to do so," that situation is highly distinguishable from Dobronski's allegations. Here, Dobronski's device was not used to enter the agreement, no username **[*14]** or password was involved, and someone (whether it was Dobronski or another individual) entered nothing more than Dobronski's phone number. Rocket, therefore, has not shown that Dobronski himself entered into its arbitration agreement.

Rocket also requests, briefly, "if the Court were to find that a dispute of fact exists or additional evidence is necessary to decide this Motion," that "the Court permit the parties 120 days to engage in limited jurisdictional discovery regarding the validity of the arbitration agreement." (ECF No. 10, PageID.61) ("Defendant's motion [to compel arbitration] is retained under advisement pending expedited discovery limited to the issue of whether plaintiff signed the arbitration agreement." (citing *Cannon v. SFM, LLC, No. 18-2364-JWL, 2019 U.S. Dist. LEXIS 22167, 2019 WL 568581, at *3 (D. Kan. Feb. 12, 2019)*)). The undersigned sees no benefit in allowing four months of discovery limited to the purpose of resolving the factual disputes around the arbitration agreement. If Dobronski has any claims remaining after the district judge's ruling, discovery should then commence on all relevant issues. But Rocket's motion to compel arbitration should be denied *without prejudice*, as discovery may produce evidence that Dobronski did indeed enter into an arbitration agreement **[*15]** with Rocket. At this stage, there is no compelling evidence that he did.

B. Causes of Action

As summarized above, Dobronski has brought fourteen counts against Rocket in his First Amended Complaint: twelve based on TCPA violations under *47 C.F.R. § 64.1200(a)*, *(c)*, and *(d)* and *47 C.F.R. § 64.1601(e)*; one based on violation of the MHSSA; and one based on a violation of the MTCCCA. (ECF No. 14, PageID.169-176). Rocket moves to dismiss each for failure to state a claim for relief.

1. Counts I - III - ATDS or Artificial/Prerecorded Voice Calls

Dobronski's first two claims arise under *47 C.F.R. § 64.1200(a)(1)(iii)* and *(a)(2)*, respectively. Both regulations prohibit any person or entity from initiating a call to a cell phone user, without prior express consent of the called party, using an automatic telephone dialing system (ATDS) or an artificial or prerecorded voice. His third claim arises under *§ 64.1200(a)(3)*, which similarly prohibits initiating "any telephone call to any residential line using an artificial or prerecorded voice to deliver a message that includes or introduces an advertisement or constitutes telemarketing without the prior express written consent of the called party."

As summarized above, Dobronski alleges that from August 11 to 19, 2025, he received twenty uninvited phone **[*16]** calls from Rocket, each of which rang only once and then terminated before Dobronski could answer the call. (ECF No. 14, PageID.163-164). Then, on September 29, Dobronski received a call that he answered and was greeted by a robotic voice informing him that a licensed specialist was ready to assist him. (*Id.*, PageID.165). Dobronski alleges that calls 1-21 were all made using an ATDS, stating:

> 60. Rocket initiates telephone calls en masse using automated telephone dialing systems which have the capacity to store or produce telephone numbers to be called using a random or sequential number generator to dial such numbers, to solicit consumers.
>
> 61. Rocket inputs lists of names and telephone numbers of consumers into their automated telephone dialing system, and the automated system will then, using the random or sequential number generator, select numbers from the lists

and dials then, and then dials the consumers' telephone numbers.

(ECF No. 14, PageID.162-163).

To sustain a claim under 64.1200(a)(1)(iii) or (a)(2) for use of an ATDS, a plaintiff must make "'some additional factual allegations, no matter how minor, in addition to parroting the language of the statute,' to sufficiently allege that [a d]efendant utilized **[*17]** a prerecorded or artificial voice or used an ATDS system." Katz v. CrossCountry Mortg., LLC, No. 1:22-CV-00925, 2022 U.S. Dist. LEXIS 207417, 2022 WL 16950481, at *3 (N.D. Ohio Nov. 15, 2022) (quoting *Reo v. Caribbean Cruise Line, Inc., No. 1:14 CV 1374, 2016 U.S. Dist. LEXIS 35596, 2016 WL 1109042, at *4 (N.D. Ohio Mar. 18, 2016)*). "'It is not unreasonable [ ] to require a plaintiff to describe the phone messages he received in laymen's terms or provide the circumstances surrounding them to establish his belief that the messages were pre-recorded or delivered via the ATDS.'" *2022 U.S. Dist. LEXIS 207417, [WL] at *3* (quoting *Johansen v. Vivant, Inc., No. 12 C 7159, 2012 U.S. Dist. LEXIS 178558, 2012 WL 6590551, at *3 (N.D. Ill. Dec. 18, 2012)*).

In *Facebook, Inc. v. Duguid*, the Supreme Court held that in all cases, ATDS must be alleged to have the capacity to use a random or sequential number generator to either store or produce numbers to be called. *592 U.S. 395, 399, 141 S. Ct. 1163, 209 L. Ed. 2d 272 (2021)* ("To qualify as an 'automatic telephone dialing system,' a device must have the capacity either to store a telephone number using a random or sequential generator or to produce a telephone number using a random or sequential number generator."). Otherwise, the claims must be dismissed. *See Barry v. Ally Fin., Inc., No. 20-12378, 2021 U.S. Dist. LEXIS 129573, 2021 WL 2936636, at *3 (E.D. Mich. July 13, 2021)*. In *Barry*, the district court found that a plaintiff who does not allege the capacity of a defendant's system to dial numbers randomly or sequentially fails to state a TCPA claim. Other courts have found that mere conclusory allegations of random or sequential number generators also fail to state a claim. *See ACA Int'l v. Fed. Commc'ns Comm'n, 885 F.3d 687, 702, 435 U.S. App. D.C. 1 (D.C. Cir. 2018)* (differentiating ATDS from a calling list, which is allowed **[*18]** under the TCPA), *Mosley v. Gen. Revenue Corp., No. 20-cv-01012-JES-JEH, 2020 U.S. Dist. LEXIS 127055, 2020 WL 4060767, at *4 (C.D. Ill. July 20, 2020)* (finding that a mere allegation of ATDS was not enough).

However, where the complaint "does not merely parrot, in a conclusory fashion, the statutory language as to the definition of an ATDS" but instead "includes several factual allegations as to the facts and circumstances surrounding the calls and texts that make it plausible that an ATDS was used," courts have found that use of ATDS was plausibly alleged. *Lopez v. Quicken Loans, Inc., 461 F. Supp. 3d 638, 645 (E.D. Mich. 2020)*. In *Lopez*, allegations that the calls were made by SMS shortcode, were of a generic and non-personal nature, and followed a pattern that included a long pause followed by a clicking sound, plausibly indicated that ATDS was used in violation of the TCPA.

Here, Dobronski does not plausibly allege that the calls were made using an ATDS. Dobronski admits that he was unable to answer the first twenty calls from Rocket, either because Rocket hung up after one ring or, as Rocket suggests, because Dobronski's Voice Over Internet Protocol (VOIP) phone service disconnected the calls as likely spam. In any event, Dobronski was later able to speak to a representative who noted that "Rocket had been attempting to contact [Dobronski] to discuss his interest in mortgage refinancing." **[*19]** (*Id.*, PageID.164). When Dobronski was able to answer the next call from Rocket, the representative explained that he called because "an online inquiry was made" under the name "Test Testing." (*Id.*, PageID.165). The fact that Dobronski denies making an online inquiry does not negate the most likely plausible inference that Dobronski was contacted because *someone* had made an online inquiry with his telephone number.

When the allegations of the complaint tacitly acknowledge that the defendant's phone call targeted the plaintiff specifically, "the plausible inference is that an ATDS was not in fact used." *Fluker v. Ally Fin. Inc., No. 22-CV-12536, 2023 U.S. Dist. LEXIS 227644, 2023 WL 8881154, at *2 (E.D. Mich. Dec. 21, 2023)*, aff'd, *No. 24-1023, 2025 U.S. App. LEXIS 16515, 2025 WL 1827747 (6th Cir. July 2, 2025)*; *see also Suttles v. Facebook, Inc., 461 F. Supp. 3d 479, 487 (W.D. Tex. 2020)* (deciding that "[a]llegations of directly targeting specific individuals weigh against an inference that an ATDS was used"); *Snow v. Gen. Elec. Co., No. 18-0511, 2019 U.S. Dist. LEXIS 99760, 2019 WL 2500407 (E.D.N.C. Jun. 14, 2019)* (holding that where the plaintiff is "a targeted recipient" of text messages, "it is not reasonable to infer that the messages were sent with equipment using a random or sequential number generator.") (citation omitted); *Cross v. State Farm Mut. Auto. Ins. Co., No. 1:20-cv-01047, 2022 WL 193016, at *8 (W.D. Ark. Jan. 20, 2022)* (dismissing ATDS claim because challenged text was targeted to specific

individual); *Samataro v. Keller Williams Realty, Inc.*, Nos. 1:21-CV-76-RP, 1:20-CV-835-RP, 1:18-CV-775-RP, 2021 WL 4927422, at *4 (W.D. Tex. Sept. 27, 2021) (dismissing TCPA "claim with prejudice because it is based on calls made to specific individuals...as opposed to generated randomly by an **[*20]** autodialer"). "[I]t is not plausible that an act can be both randomly generated and specifically targeted at the same time." *Laccinole v. Gulf Coast Collection Bureau, Inc., No. CV 22-223-JJM-LDA, 2023 U.S. Dist. LEXIS 6698, 2023 WL 157719, at *3 (D.R.I. Jan. 11, 2023)*.

As for the allegation that Rocket uses a random or sequential number generator to select phone numbers from a non-random list, such allegations do not reflect the use of an ATDS. *See, e.g., Barry, 2021 U.S. Dist. LEXIS 129573, [WL] at *3-4* (rejecting ATDS claim where "Plaintiff pleads that she, and purported class members, were called in connection with specific accounts held by Defendant for a specific purpose, and not through randomly or sequentially generated numbers"); *Aikens v. Synchrony Fin. d/b/a Synchrony Bank, No. 15-10058, 2015 U.S. Dist. LEXIS 115467, 2015 WL 5818911, at *4 (E.D. Mich. July 31, 2015)* ("Courts may not accept an assertion that an ATDS was used simply because Plaintiff states as much."), *report and recommendation adopted*, *2015 U.S. Dist. LEXIS 115023, 2015 WL 5818860 (E.D. Mich. Aug. 31, 2015)*

Dobronski can still state a claim under counts I - III without alleging use of an ATDS if he has plausibly alleged a call that began with an artificial or prerecorded voice. *47 C.F.R. § 64.1200(a)(1)(iii)*; *(a)(2)*; *(a)(3)*. For calls 1-20, as Rocket notes, such an allegation would not be plausible because Dobronski was unable to answer the calls. *See Fluker, 2023 U.S. Dist. LEXIS 227644, [WL] at *3* ("Fluker concedes that he did not personally listen to any of Ally's phone calls since he was incarcerated without his cellphone during the relevant timeframe. So it is impossible for him to provide **[*21]** a sufficient factual basis to plausibly establish that Ally used 'an artificial or prerecorded voice' when making those calls."). But for call 21, Rocket makes no argument on this point, and it is plausibly alleged that the call began with an artificial and/or prerecorded voice before connecting Dobronski with the Rocket representative. *See* ECF No. 14, PageID.165-166.

Rocket also argues for dismissal of claims relating to call 21 because his allegations "more plausibly support" that Dobronski himself, a known TCPA plaintiff, or someone acting on his behalf provided his number to Rocket for the purpose of receiving mortgage financing information. (ECF No. 19, PageID.239). "Courts should consider whether there are lawful, 'obvious alternative explanation[s]' for the alleged conduct, because '[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" *McDonough v. Anoka Cnty., 799 F.3d 931, 946 (8th Cir. 2015)* (quoting *Iqbal, 556 U.S. at 678*). Here, however, Dobronski's allegations are plausible; as discussed regarding the agreement to arbitrate claims, Rocket has presented an alternative theory as to why Dobronski received the calls, but it is **[*22]** not the only plausible one. Therefore, counts I and II should be dismissed as to calls 1-20, but counts I - III should not be dismissed as to call 21.[4]

2. Count IV - Disconnected Telemarketing Calls

*47 C.F.R. § 64.1200(a)(6)* prohibits any person or entity from "disconnect[ing] an unanswered telemarketing call prior to at least 15 seconds or four (4) rings." Rocket contends that Dobronski has merely recited the regulation and "pleads no facts to support this conclusion" that calls 1-20 were disconnected in violation of the TCPA. (ECF No. 19, PageID.241). This is not so. Dobronski has in fact meticulously logged twenty alleged calls from Rocket between August 11 and 19, 2025, from the same number, which ended after one ring. (ECF No. 14, 163-164).

---

[4] Additionally, Rocket argues that Counts I and II are duplicative or redundant and that Count II, based on ***§ 64.1200(a)(2)***, should be dismissed for this reason. Dobronski's view is that he may plead alternative, or even inconsistent claims, under *Fed. R. Civ. P. 8(d)(3)*. The undersigned agrees with Dobronski. Although ***§ 64.1200(a)(1)(iii)*** and ***§ 64.1200(a)(2)*** are very similar, there are key differences in the elements required to sustain a claim in each regulation. Section (a)(1)(iii) applies to any call made without prior express consent, whereas (a)(2) applies only to advertisements or telemarketing and requires express *written* consent with certain exceptions inapplicable here. Thus, it is proper to let both claims stand at this stage. *See Dobronski v. CHW Grp., Inc., No. 24-CV-11649, 2025 U.S. Dist. LEXIS 162742, 2025 WL 2426370, at *7 (E.D. Mich. Aug. 21, 2025)*, *motion to certify appeal denied*, *2025 U.S. Dist. LEXIS 216133, 2025 WL 3068732 (E.D. Mich. Nov. 3, 2025)* ("Defendant seems to overlook a fundamental tenet of civil litigation: plaintiffs may plead multiple theories of recovery in a case, even if recovery is only permitted under one. *See Fed. R. Civ. P. 8(d)*. Plaintiff does not fail to state his claims even if he does miscalculate damages in the event of recovery.").

Rocket says that the allegations do not support a reasonable inference that Rocket disconnected the calls, because "an equally—if not more—plausible explanation is that the disconnected calls were caused by Dobronski's phone settings or use of a 'broadband Internet connection instead of a conventional telephone line." (ECF No. 19, PageID.242). Rocket provides internet articles to show that dropped calls are a common VOIP issue, **[*23]** [5] but the FCC has found that "[t]elemarketers acknowledge that use of predictive dialers results in a certain percentage of dropped calls" as well. *In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, 14103 (2003)*. The fact that Rocket has provided, by its own admission, an equally plausible explanation for the dropped calls is no reason to dismiss a claim at this stage. Count IV should not be dismissed as to calls 1-20.

3. Counts V - VII - Abandoned Call Claims

*47 C.F.R. § 64.1200(a)(7)* governs call abandonment by a telemarketer. It states that a person or entity may not:

> Abandon more than three percent of all telemarketing calls that are answered live by a person, as measured over a 30-day period for a single calling campaign. If a single calling campaign exceeds a 30-day period, the abandonment rate shall be calculated separately for each successive 30-day period or portion thereof that such calling campaign continues. A call is "abandoned" if it is not connected to a live sales representative within two (2) seconds of the called person's completed greeting.
>
> (i) Whenever a live sales representative is not available to speak with the person answering the call, within two (2) seconds after the called person's completed greeting, the telemarketer or the seller must provide:
>
> (A) **[*24]** A prerecorded identification and opt-out message that is limited to disclosing that the call was for "telemarketing purposes" and states the name of the business, entity, or individual on whose behalf the call was placed, and a telephone number for such business, entity, or individual that permits the called person to make a do-not-call request during regular business hours for the duration of the telemarketing campaign; provided, that, such telephone number may not be a 900 number or any other number for which charges exceed local or long distance transmission charges, and
>
> (B) An automated, interactive voice-and/or key press-activated opt-out mechanism that enables the called person to make a do-not-call request prior to terminating the call, including brief explanatory instructions on how to use such mechanism. When the called person elects to opt-out using such mechanism, the mechanism must automatically record the called person's number to the seller's do-not-call list and immediately terminate the call.

Dobronski alleges that Rocket violated (1) *§ 64.1200(a)(7)* by abandoning more than three percent of all answered telemarketing calls within a thirty-day period; (2) *§ 64.1200(a)(7)(i)(A)* by failing to provide a prerecorded **[*25]** identification and opt-out message in its abandoned calls; and (3) *§ 64.1200(a)(7)(i)(B)* by failing to provide an automated, interactive opt-out mechanism in its abandoned calls. (ECF No. 14, PageID.171-173).

Rocket argues that *§ 64.1200(a)(7)* and its subsections do not establish a private right of action and that, even if they did, Dobronski has not pled facts that could sustain any of his *§ 64.1200(a)(7)* claims.

Addressing the first argument, Rocket says that *§ 64.1200(a)(7)* was promulgated under *47 U.S.C. § 227(d)*, a section of the TCPA that does not contain a private right of action provision. *§ 227(d)* governs "Technical and procedural standards" and grants authority to the FCC to set forth technical and procedural standards for (1) telephone facsimile machines and (2) artificial or prerecorded voice systems. For the latter, at issue here, it says that "all artificial or prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity

---

[5] Rocket also notes that the FCC is currently undertaking a notice and comment period to consider eliminating the rule set forth in ***47 C.F.R. § 64.1200(a)(6)***. FCC Fact Sheet, Call Branding FNPRM, Improving Verification and Presentation of Caller Identification Information, Further Notice of Proposed Rulemaking and Public Notice - CG Docket Nos. 17-59, 02-278, 25-307, and WC Docket No. 17-97 (Oct. 7, 2025). While interesting, this has no bearing on Dobronski's current claim under the regulation.

of the business, individual, or other entity initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business, other entity, or individual" and that "any such system will automatically release the called party's line within 5 seconds of the **[*26]** time notification is transmitted to the system that the called party has hung up, to allow the called party's line to be used to make or receive other calls." *47 U.S.C. § 227(d)*.

To be sure, courts have overwhelmingly found that *§ 227(d)* does not provide a private right of action for the regulations promulgated under that provision. *See, e.g., Charvat v. NMP, LLC, 656 F.3d 440, 449 (6th Cir. 2011)* ("Technical and procedural standards specific to automated calls are included in *§ 227(d)* and accompanying regulation *47 C.F.R. § 64.1200(b)*, which do not provide a private right of action or a statutory-damages provision."). But as suggested by *Charvat* and other courts, it appears that *47 C.F.R. § 64.1200(b)* is the corresponding regulation to *§ 227(d)*. Indeed, the language between *§ 64.1200(b)* and *§ 227(d)* is the most similar of all of the TCPA regulations. Rocket has cited no authority or provided any reasoning to suggest that *47 C.F.R. § 64.1200(a)(7)* or its subparts were also promulgated under *§ 227(d)*.

Dobronski contends that *§ 227(b)*, which restricts the use of automated telephone equipment, is the statutory authority for *§ 64.1200(a)(7)*. *§ 227(b)(3)* contains a clear private right of action for violations of that section, which includes regulations promulgated thereunder. The undersigned has found little discussion of the statutory authority for *§ 64.1200(a)(7)* in relevant case law, but courts tend to agree that *§ 64.1200(a)(7)* does allow **[*27]** for a private right of action. *See Dobronski v. Selectquote Ins. Servs., No. 2:23-CV-12597, 2025 U.S. Dist. LEXIS 56730, 2025 WL 904370, at *8 (E.D. Mich. Jan. 14, 2025), opinion vacated on other grounds, 784 F. Supp. 3d 976 (E.D. Mich. 2025)*; *Dobronski v. Baid, No. 24-10297, 2024 WL 3997059, at *4 (E.D. Mich. Aug. 29, 2024)*.

In *Selectquote*, the court found that

> subsection 64.1200(a)(7) appears to tackle abandoned calls in two ways. By its own terms it requires that *all* abandoned telemarketing calls use an opt-out mechanism—"[*w*]*henever* a live sales representative is not available to speak with the person answering the call, within two (2) seconds after the called person's completed greeting, the telemarketer or the seller *must* provide [an opt-out]." *§ 64.1200(a)(7)(i)*. And then, even if the caller has an opt-out mechanism, it cannot rely on it too much—that is, it cannot "[a]bandon more than three percent of all telemarketing calls" in a single campaign. *§ 64.1200(a)(7)*.

*2025 U.S. Dist. LEXIS 56730, 2025 WL 904370, at *9*.

This finding is consistent with the FCC interpretation of the regulation. As the FCC explains, implementing a three percent abandonment rate measured over a 30-day period was done to "ensure that consumers consistently receive fewer disconnected calls, and that telemarketers are permitted to manage their calling campaigns effectively under the new rules on abandoned calls." *In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. at 14106*. It then explains that calls will be considered abandoned if they are not transferred to a live representative within two seconds of a completed automated **[*28]** greeting in order to "address the problem of 'dead air'" produced by dialing technologies. *Id.* "Calls disconnected because they were never answered (within the required 15 seconds or 4 rings) or because they received busy signals will not be considered abandoned." *Id.* The FCC also determined that "when a telemarketer abandons a call *under the three (3) percent rate allowed*, the telemarketer must deliver a prerecorded message containing the name of the business, individual or other entity initiating the call, as well as the telephone number of such business, individual or other entity." *Id.* (emphasis added).

The FCC declined to address whether this or other subsections permitted a private cause of action, opting to leave that to Congress and the courts. However, it is clear enough that this one does not fall under *§ 227(d)*'s technical and procedural standards, which are fully encompassed in *§ 64.1200(b)*, and without a private right of action—as other courts to consider the question have presumed—it is entirely unclear who would enforce these regulations on telemarketers.

Given that *§ 64.1200(a)(7)* and its subparts contain private rights of action, it is clear that not all of the alleged calls to Dobronski were "abandoned" **[*29]** in order to sustain his claims. For calls 1-20, Dobronski states in the amended complaint that "the inbound call rang once and immediately terminated before Plaintiff could answer the telephone." (ECF No. 14, PageID.164). Abandoned calls are those that contain a completed greeting and are then not connected to a live sales representative within two seconds thereafter. The

FCC guidance supports this conclusion, as those calls fall under the disconnected telemarketing call regulation. *§ 64.1200(a)(6)*. Only call 21 could be classified as abandoned. Dobronski alleges that he was not connected to a live sales representative within two seconds of the completed greeting during that call, which must be taken as true on a motion to dismiss. (*Id.*, PageID.171). He further alleges that Rocket abandoned more than three percent of its telemarketing calls in this manner, that call 21 did not contain the required identification and opt-out message, and that it did not provide an automated, interactive opt-out mechanism. (*Id.*, PageID.172-173).

Rocket argues that Dobronski failed to provide information about Rocket's general abandonment rate of calls that could lead to a plausible inference that Rocket did in fact **[*30]** violate *§ 64.1200(a)(7)*'s required three percent or less rate. One court has dismissed a *§ 64.1200(a)(7)* claim for similar reasons. *See Dahdah v. Rocket Mortg., LLC, No. 22-11863, 2023 U.S. Dist. LEXIS 161335, 2023 WL 5941730, at *5 (E.D. Mich. Sept. 12, 2023)* ("To state a violation of this provision, Dahdah must plausibly allege that no more than three percent of live telemarketing calls were "abandoned," which means that the call was not connected to a live sales representative within two seconds of the called person's greeting. This provision requires information about the abandonment rate, which Dahdah's complaint fails to mention."), *opinion vacated on reconsideration*, No. 22-11863, 2023 WL 11944898 (E.D. Mich. Nov. 17, 2023), *rev'd and remanded*, *166 F.4th 556 (6th Cir. 2026)*. However, if Dobronski can establish that Rocket's prerecorded message to him led to abandonment of the call, he can also infer that Rocket abandons its calls at a rate above three percent, and he has stated such in the complaint. Under *§ 64.1200(a)(7)(iii)*, the seller or telemarketer must maintain records establishing its compliance with (a)(7). Therefore, rather than dismiss Dobronski's claim here, the Court should allow Rocket to defend the claim with the records it is required to keep under this section.

Furthermore, Dobronski's claims under *§ 64.1200(a)(7)(i)(A)* and *(i)(B)* are not governed by the three percent abandonment rate. *See Selectquote, 2025 U.S. Dist. LEXIS 56730, [WL] at *9* ("The regulation does not state that it becomes necessary **[*31]** to use an opt-out mechanism only after a caller has abandoned three percent of calls, or that an answerer cannot sue when a caller fails to comply with the three-percent rule in calls to others."). These subsections require *all* abandoned calls to contain the information and opt-out mechanisms described therein. Therefore, Dobronski's three *§ 64.1200(a)(7)* claims should be dismissed as to calls 1-20, but not as to call 21.

4. Count VIII - National Do Not Call Registry

Dobronski next alleges violations of *47 C.F.R. § 64.1200(c)(2)*, which prohibits telephone solicitations to any residential telephone subscriber whose number is registered on the National Do Not Call Registry. *§ 64.1200(c)(2)* is limited by its enabling statute, *47 U.S.C. 227(c)(5)*, which states that "[a] person who has received *more than one* telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring an action. (emphasis added). Rocket says that it has not violated *§ 64.1200(c)(2)* because calls 1-20 are not plausibly alleged to have been "telephone solicitations"; call 21 would thus be the only call, which is not *more than one* call; call 21 was not a "telephone solicitation" because it was made in response to an online **[*32]** inquiry; and call 22 was not a "telephone solicitation" because it was a text message that did not encourage Dobronski to purchase, rent, or invest in any goods or services.

The TCPA statute defines "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person" but not a call or message made with prior express permission, in the course of an established business relationship, or by a tax exempt nonprofit organization. Rocket's assertion that these calls and messages were made with prior consent, due to Dobronski's "online inquiry," is a question of fact, as explained above in regard to Rocket's motion to compel arbitration.

Whether calls 1-20 were telephone solicitations is also a question of fact. Had Dobronski simply not answered these calls because he could not get to them in time, there would be little to suggest that that the calls were indeed solicitations. However, Dobronski explains that after receiving call 20, he initiated a "confrontation call" by calling the number that appeared on his caller ID for these calls. (ECF No. **[*33]** 14, PageID.164). He was then able to speak to a Rocket representative named Blake, who explained that Rocket had been attempting to contact him "to discuss his interest in mortgage refinancing." This is enough to plausibly establish that the *purpose* of calls 1-20 was to encourage a purchase or investment under the TCPA. Whether Dobronski had expressed such interest prior to the calls must be

determined at a later stage. Thus, Dobronski's *§ 64.1200(c)(2)* claims for calls 1-21 should not be dismissed.

Similarly, "call 22," which is a text message he received while on the line during call 21, also states a claim. Rocket argues, briefly, that it should not because it was a text message that only included the contact information of a Rocket Mortgage team member. The Court must "approach the problem with a measure of common sense." *Chesbro v. Best Buy Stores, L.P., 705 F.3d 913, 918 (9th Cir. 2012)*. Here, where Dobronski received a text message containing Rocket's contact information while on a call from a Rocket representative, one could presume that the text was intended to encourage a purchase or investment from Dobronski. Thus, Dobronski has plausibly alleged 22 total calls or messages in violation of *§ 64.1200(c)(2)*.

5. Counts VIII - XI - National and Internal Do-Not-Call Lists

As **[*34]** noted above, Dobronski alleges violations of *47 C.F.R. § 64.1200(c)(2)*, which prohibits telephone solicitations to a number registered on the National Do Not Call Registry. He also alleges violations of *§ 64.1200(d)(1)*, *(d)(3)*, and *(d)(4)*, which relate to an entity's procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of the entity. Each of these regulations only applies to calls to a "residential telephone subscriber."

Rocket argues that Dobronski, who was called on his "cellular telephone number" provided via VOIP technology over a broadband Internet connection does not qualify as a "residential telephone subscriber" under these regulations or the associated statute, *47 U.S.C. § 227(c)*. (ECF No. 14, PageID.156-157).

Neither the regulations nor statute define "residential telephone subscriber." Rocket acknowledges that in 2003, the FCC concluded that "the national database should allow for the registration of wireless telephone numbers, and that such action will better further the objectives of the TCPA and the Do-Not-Call Act." *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. at 14037-38 (2003)*.

> In so doing, we agree with the FTC and several commenters that wireless subscribers should not be excluded from the protections of the TCPA, particularly the option to register **[*35]** on a national-do-not-call list. Congress has indicated its intent to provide significant protections under the TCPA to wireless users. Allowing wireless subscribers to register on a national do-not-call list furthers the objectives of the TCPA, including protection for wireless subscribers from unwanted telephone solicitations for which they are charged.

*Id.* (footnotes omitted). The FCC also noted that not all cellular phone subscribers are necessarily "residential":

> As a practical matter, since determining whether any particular wireless subscriber is a "residential subscriber" may be more fact-intensive than making the same determination for a wireline subscriber, we will presume wireless subscribers who ask to be put on the national do-not-call list to be "residential subscribers." Such a presumption, however, may require a complaining wireless subscriber to provide further proof of the validity of that presumption should we need to take enforcement action.

*Id. at 14039* (footnotes omitted).

Rocket urges the Court to reject the FCC ruling and conduct an independent review of the statutory language under *Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412, 144 S. Ct. 2244, 219 L. Ed. 2d 832 (2024)* ("Courts must exercise their independent judgment in deciding whether an agency has acted within **[*36]** its statutory authority"); *see also McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp., 606 U.S. 146, 145 S. Ct. 2006, 222 L. Ed. 2d 405 (2025)* (applying the *Loper Bright* principle to the TCPA). According to Rocket, the FCC's determination that cellular subscribers—and by extension, VOIP subscribers—qualify as residential telephone subscribers is counter to the plain text of the statute and the purpose of the TCPA with respect to the do-not-call registry. "At bottom," Rocket says, "Congress did not intend for the DNC protections to extend to nascent technologies of portable telephones, let alone technologies that did not exist." (ECF No. 19, PageID.250).

In support of this contention, Rocket cites *Shelton v. Fast Advance Funding, LLC, 378 F. Supp. 3d 356, 363 n.7 (E.D. Pa. 2019), aff'd, 805 F. App'x 156 (3d Cir. 2020)*. There, the defendant did not raise the issue of whether cell phones fit within the residential telephone subscriber framework in reference to the do-not-call registry. However, the court considered in a footnote whether TCPA protections under *§ 227(c)*, premised on a number's inclusion on the registry, should extend to

cell phone numbers on the registry.

> The definition of residential is "used as a residence or by residents," and "resident" is defined as "living in a place for some length of time," or "one who resides in a place." *Residential*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/residential; **[*37]** *Resident*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/ residents. Therefore, the plain language of "residential telephone" describes a telephone used by individuals in the home, and not a cellular telephone, which can be used anywhere. Furthermore, the TCPA specifically mentions "cellular telephone service" in *§ 227(b)* and *§ 64.1200(a)(1)(iii)*, indicating that both Congress and the FCC were aware of the distinction between a cellular telephone and a residential telephone and purposely protected only "residential telephone subscribers" under *§ 227(c)*, *§ 64.1200(c)* and *(d)*. "A familiar principle of statutory construction ... is that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute." *Hamdan v. Rumsfeld, 548 U.S. 557, 578, 126 S. Ct. 2749, 165 L. Ed. 2d 723 (2006)*. The Court, therefore, is not convinced that Congress and the FCC, through the TCPA and its regulations, intended to protect "cellular telephone subscribers" along with "residential telephone subscribers." Again, however, Defendant did not raise this argument, and therefore it will not be considered in the Court's findings.

*Id.*

A later court noted that "[t]he consensus in [the Third] Circuit is that Do Not Call claims may apply to cell **[*38]** phones." *Jackson v. Direct Bldg. Supplies LLC, No. 4:23-CV-01569, 2024 U.S. Dist. LEXIS 8811, 2024 WL 184449, at *4 (M.D. Pa. Jan. 17, 2024)* (quoting *Dudley v. Vision Solar, LLC, No. CV 21-659, 2021 U.S. Dist. LEXIS 135609, 2021 WL 3077557, at *5 (E.D. Pa. July 21, 2021)*; *see also Atkinson v. Choice Home Warranty, No. CV 22-04464, 2023 U.S. Dist. LEXIS 5570, 2023 WL 166168, at *4 (D.N.J. Jan. 11, 2023)* (finding that do-not-call claims may apply to cell phones and that, when listed on the National Do Not Call Registry, such phones are presumed to be residential at the motion to dismiss stage). The *Jackson* court disagreed with the dicta in *Shelton*, stating that "appealing to plain language when attempting to define ambiguous terms takes the conclusion for granted." *2024 U.S. Dist. LEXIS 8811, 2024 WL 184449, at *5*.

The *Jackson* court reasonably determined that in the language of *§ 227(c)(1)*, "residential telephone subscriber" was most naturally read so that "residential" and "telephone" both modify the word "subscriber." *Id.* Thus, the statute speaks not of a "residential telephone," but rather, "a 'telephone subscriber' who has subscribed for 'residential,' *i.e.*, personal, purposes." *Id.* ("[T]he inquiry to determine whether a phone number qualifies as a 'residential telephone subscriber' focuses on whether the subscriber has and uses the phone for residential purposes, regardless of if the subscriber also uses the phone for other purposes." (citing *Mantha v. Quotewizard.com, LLC, No. CV 19-12235-LTS, 2022 U.S. Dist. LEXIS 19502, 2022 WL 325722, at *5 (D. Mass. Feb. 3, 2022)*)). In *Mantha*, the court stated that this was not only "the necessary conclusion stemming from the ordinary meaning of 'residential telephone subscriber' in 1991" but also "the **[*39]** sensible approach in conformity with the language and purpose of the statute." *2022 U.S. Dist. LEXIS 19502, 2022 WL 325722, at *5*.

The *Jackson* and *Mantha* courts go on to explain that the *§ 227(c)*'s focus on the "telephone subscribers" themselves, by comparison to other sections of the TCPA, make clear that the term "residential" here is a "functional term not tethered to a particular technology," focusing instead on the subscriber's privacy rights. *See Jackson, 2024 U.S. Dist. LEXIS 8811, 2024 WL 184449, at *7*. This is not only the better interpretation of the plain language of the statute, but also best preserves the purpose of the TCPA. *See, e.g., id.* ("As was true in 1991 and as is more true today, cellphones are often used in the residence for personal purposes as well as in other locations, and indeed many exclusively use cellphones in their residence and do not own landline phones."); *In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. at 14038* ("[I]t is well-established that wireless subscribers often use their wireless phones in the same manner in which they use their residential wireline phones."); *Cranor v. 5 Star Nutrition, 998 F.3d 686, 691 (5th Cir. 2021)* (ruling upon *section 227(b)*) ("The TCPA cannot be read to regulate unsolicited telemarketing only when it affects the home.").

Neither party has cited a case analyzing *§ 227(c)*'s applicability to cell phone or VOIP subscribers post-*Loper Bright*, but in the undersigned's independent review **[*40]** of the statute, the above cases and

explanations, including the FCC's, make the most sense. Furthermore, three district courts have found, post *Loper Bright*, that the TCPA's do-not-call protections apply to cell phones. *See Lirones v. Leaf Home Water Sols., LLC, No. 5:23-CV-02087, 2024 U.S. Dist. LEXIS 165900, 2024 WL 4198134, at *6 (N.D. Ohio Sept. 16, 2024)*; *Cacho v. McCarthy & Kelly LLP, 739 F. Supp. 3d 195, 204 (S.D.N.Y. 2024)*; *Lyman v. Quinstreet, Inc., No. 23-CV-05056-PCP, 2024 U.S. Dist. LEXIS 123132, 2024 WL 3406992, at *4 (N.D. Cal. July 12, 2024)*. The undersigned agrees. The technological nature of Dobronski's phone number, which is listed on the National Do Not Call Registry, does not bar Dobronski from the protections of the TCPA.

Rocket also argues that, notwithstanding this technological nature, Dobronski must plausibly allege that his number is used for "residential purposes" to state a claim based on *§ 227(c)*. Rocket says that Dobronski's allegation of the number being used "primarily for personal, family, and household communications, and not for business purposes" (ECF No. 14, PageID.156) is conclusory, especially given Dobronski's prolific filing of TCPA complaints. Federal courts have held that whether someone qualifies as a "residential telephone subscriber" depends on whether the number is the "primary means of reaching the individual at their residence - that is, there is no other landline or phone at their residence which is instead the primary means of reaching them." *Mantha, 2022 U.S. Dist. LEXIS 19502, 2022 WL 325722, at *6*. Rocket argues that Dobronski's numerous **[*41]** lawsuits "indicate that the at-issue phone number appears instead to be used for the primary purpose of filing TCPA lawsuits as a business," although it fails to point to any other cases Dobronski has filed regarding this particular number. (ECF No. 19, PageID.252).

Courts have found that allegations similar to Dobronski's—that he primarily uses the number for personal, not business purposes and that it is listed on the National Do Not Call Registry—are sufficient at this stage to establish that he is a residential telephone subscriber. *See, e.g., Tsolumba v. SelectQuote Ins. Servs., No. 5:22-CV-00712, 2023 U.S. Dist. LEXIS 167022, 2023 WL 6146644, at *5 (N.D. Ohio Sept. 20, 2023)*; *Cacho, 739 F. Supp. 3d at 208*; *see also Chennette v. Porch.com, Inc., 50 F.4th 1217, 1225 (9th Cir. 2022)* (finding, in the absence of FCC guidance, that a number used for both personal and business purposes can be "residential"). To be sure, Dobronski may eventually need to put "forth evidence establishing that [his] cellular telephone is used for residential purposes." *See Stevens-Bratton v. TruGreen, Inc., 437 F. Supp. 3d 648, 656 (W.D. Tenn. 2020)* (citing cases). But at this stage, his well-pled allegations are enough. Dobronski has adequately alleged that he is a residential telephone subscriber under *§ 227(c)* and *47 C.F.R. § 64.1200(c)(2)* and *(d)*.

6. Counts IX - XI - Internal Do-Not-Call List Procedures

Rocket also argues an alternative reason to dismiss Counts IX, X, and XI, which are based on *47 C.F.R. § 64.1200(d)(1)*, *(d)(3)*, and *(d)(4)*, respectively. *§ 64.1200(d)* requires a person **[*42]** or entity making any otherwise allowable telephone solicitations to institute procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity. The relevant minimum standards Rocket is required to follow are:

> (1) Written policy. Persons or entities making artificial or prerecorded-voice telephone calls pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.
>
> ...
>
> (3) Recording, disclosure of do-not-call requests. If a person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making such calls (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call **[*43]** request within a reasonable time from the date such request is made. This period may not exceed ten (10) business days from the receipt of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the call is made, the person or entity on whose behalf the call is made will be liable for any failures to honor the do-not-call request. A person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) or

any call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a call is made or an affiliated entity.

(4) Identification of callers and telemarketers. A person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone **[*44]** number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

Rocket says that the subsections of *§ 64.1200(d)* are not separate causes of action, and that the only requirement to avoid violating (d) is that it has the necessary procedures in place prior to initiating a call, citing *Simmons v. Charter Commc'ns, Inc., 222 F. Supp. 3d 121, 138- 41 (D. Conn. 2016)*, *aff'd*, *686 F. App'x 48 (2d Cir. 2017)*; *Benzion v. Vivint, Inc.*, *No. 12-61826, 2014 WL 11531368, at *5 (S.D. Fla. Jan. 17, 2014)*; *Burdge v. Ass'n Health Care Mgmt., No. 1:10-CV-00100, 2011 U.S. Dist. LEXIS 9879, 2011 WL 379159, at *4 (S.D. Ohio Feb. 2, 2011)*, and other similar cases. Further, Rocket says that the allegations make clear that it did have such a policy in place, and that other courts have found as a matter of law that Rocket is compliant with the regulation. *See Nece v. Quicken Loans, Inc. (n/k/a/ Rocket Mortgage), No. 8:16-cv-2605-T-23CPT, 2018 U.S. Dist. LEXIS 42356, 2018 WL 1326885, at *7-8 (M.D. Fla. Mar. 15, 2018)*.

Dobronski counters that he has alleged requisite facts to state his claims under each of the three *§ 64.1200(d)* subsections. He first has alleged that he made a demand to Rocket representative Rasmus to receive a copy of Rocket's do-not-call policy, and that Rasmus could not provide one. (ECF No. 14, PageID.166). Dobronski was then forwarded to client relations, who also could not provide one. (*Id.*, PageID.167). His call was forwarded again, and this time Dobronski was told that it would be looked into, but as of the time of filing of the amended complaint, Dobronski had not received one. (*Id.*, PageID.168). Rocket says that on December **[*45]** 15, 2025, its counsel in this matter provided Dobronski with a copy of its do-not-call policy in effect as of September 29, 2025. (ECF No. 23, PageID.323).

Regarding *§ 64.1200(d)*, the Sixth Circuit has held that "[t]he 'violation of the regulations' is therefore the initiation of the phone call without having implemented the minimum procedures." *Charvat v. GVN Michigan, Inc., 561 F.3d 623, 632 (6th Cir. 2009)*. Thus, Rocket cannot be liable for failing to have or provide its do-not-call policy as required by (d)(1). Rocket *can* be liable for failing to have such a written policy, *available on demand*, at the time that it placed calls 21 and 22. *See Dobronski v. Selectquote Ins. Servs., 2025 U.S. Dist. LEXIS 56730, 2025 WL 904370, at *11* (concluding that since Dobronski was not provided with a do-not-call policy upon request, "a jury could conclude that, even if [the defendant] had a written policy, it was not 'available upon demand' at the time of the call."); *Hamilton v. Voxeo Corp.*, No. 07-cv-404, 2009 WL 1868542, at *4 (S.D. Ohio June 25, 2009) ("[T]he fact [that the telemarketer]...refused to provide him a copy would be some proof that...it did not have a written policy available on demand."). For Count VIII, the same is true. Dobronski's inability to obtain Rocket's do-not-call policy upon request until months after this litigation commenced, from Rocket's counsel in this case, suggests that Rocket violated *§ 64.1200(d)(1)* because its do-not-call policy **[*46]** was not available on demand.

Likewise, for (d)(3) and (d)(4), Dobronski has plausibly alleged that when calls 21 and 22 were made, Rocket had failed to record Dobronski in its do-not-call list and to provide its address as required by these regulations.[6] *See Charvat v. NMP, LLC, 2012 U.S. Dist. LEXIS 139505, 2012 WL 4482945, at *2* (finding that 44 alleged calls in violation of (d)(3) and (d)(4) stated 44 claims under *§ 227(c)(5)*).[7]

7. Count XII - Caller Identification

Dobronski also claims that Rocket is liable for violating *47 C.F.R. § 64.1601(e)*, which requires that any person

---

[6] Rocket has argued that it did not violate (d)(3) because Dobronski had made a second online inquiry, thereby consenting to the call. This is, however, a question of fact that can be resolved after discovery.

[7] For Dobronski's claims under ***§ 64.1200(c)*** and ***(d)***, governed by *§ 227(c)(5)*, each allegedly offending call constitutes one claim for the purpose of damages, no matter how many sections or subsections it may violate. *See Charvat v. GVN Michigan, Inc., 561 F.3d at 632*.

or entity engaged in telemarketing under the TCPA must transmit caller identification information. Dobronski claims that for calls 1-21, Rocket or its agent initiated a telemarketing call but did not transmit caller identification information that included the name of the entity. (ECF No. 14, PageID.175). Rocket argues that this claim must fail because Congress did give the FCC authority to issue caller identification regulations under 47 U.S.C. § 227(e)(3), but did not create a corresponding private right of action.

The parties acknowledge that courts are split on which section of the TCPA was used to implement § 64.1601(e) and whether or not it was a section that contains a private right of action. The undersigned has previously opined as follows on the issue:

> Numerous **[*47]** courts have found that this regulation does not promulgate a private cause of action. *See, e.g., Dobronski v. Total Insurance Brokers, LLC*, No. 21-10035, 2021 WL 4338957, at *7 (E.D. Mich. May 14, 2021); *Dobronski v. Sunpath Ltd., No. 19-13094, 2020 U.S. Dist. LEXIS 251990, 2020 WL 8840311, at *7 (E.D. Mich July 20, 2020)*; *Dobronski v. Selectquote Insurance Services, 462 F. Supp. 3d 784 790 (E.D. Mich. 2020)*. Relying on the analysis in *Worsham v. Travel Options, Inc., No. JKB-14-2749, 2016 U.S. Dist. LEXIS 118774, 2016 WL 4592373, at *7 (D. Md. Sept. 2, 2016)*, *aff'd*, *678 F. App'x 165 (4th Cir. 2017)*, these courts have reasoned that *§ 64.1601(e)(1)* was not promulgated under subsection *b* or *c* of the TCPA, and hence includes no private right of action.
>
> Dobronski argues that the Court should instead follow *Worsham v. LifeStation, Inc., No. 661, Sept. Term 2020, 2021 Md. App. LEXIS 1014, 2021 WL 5358876 (Md. Ct. Spec. App. Nov. 17, 2021)*. While acknowledging that "the FCC's consideration of what network information must be transmitted via Caller ID is technical," the *LifeStation* court reasoned that the caller ID requirement fell under the scope of *§ 227(c)* rather than *§ 227(d)* because it would exceed the scope of regulation under the latter, and because it serves *§ 227(c)*'s purpose of "protect[ing] subscribers from unrestricted commercial telemarketing calls." *LifeStation, 2021 Md. App. LEXIS 1014, 2021 WL 5358876, at *17*.
>
> Post-*LifeStation*, the Michigan Court of Appeals considered whether this was persuasive.
>
> > Having reviewed the statutes, regulations, and relevant case law, we conclude that there is no private right of action with respect to *47 CFR 64.1601(e)*. First and most critically, there is nothing in the statute that clearly indicates that Congress intended for private lawsuits to enforce caller-ID requirements. Subsection (b) prohibits certain prerecorded robocalls, and subsection (c) provides for various do-not-call **[*48]** protections. The caller-ID regulation does not fit squarely within either of these subsections, either conceptually or technically. Second and relatedly, when promulgating *47 CFR 64.1601(e)*, the FCC did not indicate that either subsection (b) or (c) was the statutory authority for that regulation. Had there been an intent to create a private right of action by Congress, or an understanding by the FCC that Congress had so intended, then one would expect more clarity in the statute or regulation, especially when private rights of action were expressly created elsewhere in the federal scheme. If a statute and its implementing regulations have expressly created a private right of action in one section, but have not expressly done so elsewhere, then it is "highly improbable" that Congress and the FCC "absentmindedly forgot to mention an intended private action." *Transamerica Mtg Advisors, Inc v Lewis, 444 U.S. 11, 20, 100 S. Ct. 242, 62 L. Ed. 2d 146 (1979)*.
>
> *Dobronski v. Transamerica Life Ins. Co., [347 Mich. App. 92, 114, 13 N.W.3d 895, 906 (2023)]*.
>
> A recent Eastern District of Michigan case has also reaffirmed the stance that *§ 64.1601(e)(1)* was not likely intended to contain a private cause of action in the absence of any statement to the contrary. *Dobronski v. Tobias & Assocs., No. 5:23-CV-10331, 2023 U.S. Dist. LEXIS 193553, 2023 WL 7005844, at *8 (E.D. Mich. Sept. 25, 2023)*.

*Dobronski v. Fam. First Life, LLC, No. 2:22-CV-12039, 2024 U.S. Dist. LEXIS 27096, 2024 WL 575858, at *18-19 (E.D. Mich. Jan. 19, 2024)*, *report and recommendation adopted in relevant part*, *No. 22-CV-12039, 2024 U.S. Dist. LEXIS 58517, 2024 WL 1342668 (E.D. Mich. Mar. 29, 2024)*. The undersigned therefore concluded that no cause of action existed, and the district court agreed. *Id.*

However, since **[*49]** the undersigned's opinion in *Family First*, more authorities have weighed in on the

statutory language and found that § 64.1601(e) does in fact contain a private right of action. Most notably, in *Dobronski v. Selectquote Ins. Servs., 773 F. Supp. 3d 373 (E.D. Mich. 2025)* (*Selectquote II*), the district court considered and granted a motion for reconsideration that dealt solely with the issue. There, the court first noted that because § 64.1601(e) predated § 227(e), it must have been promulgated under §§ 227(b), 227(c), or 227(d), because it "must have been promulgated under *some* part of the TCPA." *Selectquote II, 773 F. Supp. 3d at 376*. Those regulations generally govern the following:

- § 227(b)(2) authorizes the FCC to implement requirements that relate to the use of automatic telephone dialing systems

- § 227(c) authorizes the FCC to promulgate rules relating to the "need to protect residential telephone subscribers' privacy rights"

- § 227(d)(1)-(3) allow regulations technical and procedural standards related to fax machines, automatic telephone dialing systems, and "systems that are used to transmit any artificial or prerecorded voice message"

*Id.*

The *Selectquote II* court noted that at the time, the majority view was that § 227(d) provided authority for § 64.1601(e), which Rocket now argues. *Id. at 375*. But these opinions were all directly influenced by the opinion in *Worsham v. Travel Options, Inc.*, which the **[*50]** *Selectquote II* court found unconvincing. *Id. at 377-78*. Instead, the court reasoned that "[§] 227(d)(1) relates only to fax machines and automatic telephone dialing systems, (d)(2) relates only to fax machines, and (d)(3) applies only to artificial and prerecorded voice messages." *Id. at 376*. "It is thus unclear from where in those subsections the FCC gained authority to create a blanket requirement applying to all calls, including those that do not relate to automatic dialing, fax machines, or artificial or prerecorded messages." *Id.* (citing Worsham v. LifeStation, Inc., 2021 Md. App. LEXIS 1014, 2021 WL 5358876, at *17).

According to *Selectquote II*, the only subsection (existing at the time of implementation) broad enough to encompass the § 64.1601(e) regulations is § 227(c), which as discussed above, does contain a private right of action. § 227(c) required the FCC to "compare and evaluate alternative methods and procedures (including the use of electronic databases, telephone network technologies[)] ... for their effectiveness in protecting such privacy rights." Then the FCC had to "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish the purposes of this section." Afterward, the FCC would promulgate regulations to support consumer privacy **[*51]** rights. Intuitively, a caller ID requirement seems to use a telephone network technology to help protect privacy rights.

*Id. at 376-77*.

In *Worsham v. Travel Options, Inc.*, the court found that the caller ID regulations merely support consumers' enforcement efforts under § 227(c), and thus do not create a separate mechanism for an actionable claim. 2016 WL 4592373, at *4. But it does not follow that regulations protecting consumers' privacy rights must be from one place, and regulations supporting consumers' ability to enforce their rights be from another. To the contrary, if a caller can shield themselves from TCPA liability by obscuring its identification information, it only further supports the purpose of the TCPA to allow the identification itself to be privately enforceable.

Furthermore, it is not the case that this means Congress "intended to create a private right of action but forgot to say so." (ECF No. 19, PageID.259); *see* Meyer v. Cap. All. Grp., No. 15-CV-2405, 2017 U.S. Dist. LEXIS 183690, 2017 WL 5138316, *16 (S.D. Cal. Nov. 6, 2017) ("Where a statutory scheme and its implementing regulations have expressly created a private right of action but have not expressly done so elsewhere in the same scheme, it is highly improbable that Congress—or here, the FCC—absent mindedly forgot to mention an intended private action."). **[*52]** As noted in *Selectquote II*, "it is clear in this circuit that § 227(c) creates rights of action for violations of some parts of TCPA regulations despite their lack of express linking language." *Selectquote II, 773 F. Supp. 3d at 380*; *see also* Charvat v. NMP, LLC, 656 F.3d at 448 (noting that § 64.1200(d), which does not mention § 227(c), was promulgated to implement § 227(c) and thus is privately enforceable).

Dobronski points out that post-*Selectquote II*, many other courts have concluded that there is a private right of action for § 64.1601(e) violations. *See, e.g.,* Barton v. Bright Solar Mktg. LLC, No. 3:25-CV-05310-DGE, 2025 U.S. Dist. LEXIS 200521, 2025 WL 2880136, at *6

(W.D. Wash. Oct. 9, 2025); Dobronski v. CHW Group, Inc., No. 24-CV-11649, 2025 U.S. Dist. LEXIS 162742, 2025 WL 2426370, at *8 (E.D. Mich. Aug. 21, 2025); Dobronski v. Ins. Supermarket Inc., No. 23-10149, 2025 U.S. Dist. LEXIS 221630, 2025 WL 3121332, at *14 (E.D. Mich. Aug. 1, 2025); Newell v. JR Capital, LLC, 791 F. Supp. 3d 571, 582 (E.D. Pa. 2025). The undersigned finds these cases and the *Selectquote II* analysis persuasive; Dobronski may pursue an action based on § 64.1601(e) violations.

Rocket also argues that even if there is a private right of action, Dobronski has failed to plead it because Rocket is only required to provide the proper caller ID when it is available by the telemarketer's carrier. *See* 47 C.F.R. §§ 64.1600, 64.1601(e)(1). Rocket then says that the amended complaint is "devoid of any facts alleging that the telephone carrier had the ability to display the name of its customers on a caller ID received by Dobronski's VoIP service." Again, Dobronski has alleged enough to state a caller ID claim, and if Rocket's carrier is unable to transmit its name to VOIP telephone services, Rocket may make that showing **[*53]** at the summary judgment stage. *See In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. at 14121 ("If the information required is not passed through to the consumer, through no fault of the telemarketer originating the call, then the telemarketer will not be held liable for failure to comply with the rules." In such a case, "the telemarketer must provide clear and convincing evidence that the caller ID information could not be transmitted.") (footnote omitted).

8. Counts XIII - XIV - State Law Claims

Dobronski's last two claims sound under state law, specifically the MHSSA, M.C.L. § 445.111a(5), and the MTCCCA, M.C.L. § 484.125(2)(a). Under the MHSSA, Dobronski claims that Rocket has violated the statute by making 22 telephone solicitations to a residential telephone subscriber whose number is listed on the National Do Not Call Registry. (ECF No. 14, PageID.175). He claims Rocket violated the MTCCCA by using a telephone line to deliver a recorded message for the purpose of commercial advertising without consent or authorization. (*Id.*, PageID.176).

Like Dobronski's TCPA claim regarding the National Do Not Call Registry, Rocket says his MHSSA claim must fail because he has not alleged telephone solicitations, his VOIP serviced cell phone plan does not satisfy the "residential telephone service" requirement, **[*54]** and his allegations are insufficient to show that his number is indeed residential. For the same reasons that those arguments were rejected as pertaining to *47 C.F.R. § 64.1200(c)*, *supra*, those arguments are rejected as to the MHSSA.[8] Dobronski's claim should not be dismissed at this stage.

The MTCCCA prohibits delivering a recorded message to a subscriber at their residence for the purpose of "presenting commercial advertising" except when the subscriber has "knowingly and voluntarily requested, consented, permitted, or authorized the contact from the caller" or when the subscriber has "knowingly and voluntarily provided his or her telephone number to the caller." M.C.L. § 484.125(2)(a)(i), (ii). As with the above TCPA claims, Rocket's reasoning that Dobronski made an online inquiry and thus consented to the call is an issue of fact that cannot be decided at this stage.

Rocket also argues that call 22, which was a text message, cannot qualify as a "recorded message" in order to be liable under the MTCCCA. *See* M.C.L. § 484.125(2)(a). Neither party cites authority on the issue under the MTCCCA, but Rocket cites several cases regarding text messages under the TCPA. Each of these cases stands for the same distinguishable proposition: that a text message is not **[*55]** an "artificial or prerecorded voice" under the TCPA. *See* Trim v. Reward Zone USA LLC, 76 F.4th 1157, 1158 (9th Cir. 2023) (noting that a text message is not a prerecorded voice message because the congressional intent was for "voice to include only an audible sound, and not a more symbolic definition such as an instrument or medium of expression."); Eggleston v. Reward Zone USA LLC, No. 2:20-cv-01027-SVWKS, 2022 U.S. Dist. LEXIS 20928, 2022 WL 886094, at *6 (C.D. Cal. Jan. 28, 2022) ("[T]ext messages do not constitute a 'voice' under the TCPA."), *aff'd sub nom.* Trim v. Reward Zone USA LLC, 76 F.4th 1157 (9th Cir. 2023); Glauser v. GroupMe, Inc., No. C 11-2584 PJH, 2015 U.S. Dist. LEXIS 14001, 2015 WL 475111, at *6 (N.D. Cal. Feb. 4, 2015) (rejecting the theory that a text message constituted artificial or prerecorded voice when plaintiff "present[ed] no authority for the argument"). Rocket then states, without further explanation, that "[t]he MTCCCA prohibits 'recorded message[s]' for commercial advertising, which means voice messages, not text messages." (ECF No. 19, PageID.240) (citing

---

[8] The MHSSA also fails to define "residential telephone service," such that the above analysis of how "residential telephone subscriber" applies to VOIP services and cell phones applies here.

M.C.L. § 484.125(2)).

In response, Dobronski argues that "recorded message" is undefined in the MTCCCA and that the Court must therefore apply the term's "ordinary meaning." (ECF No. 21, PageID.279) (citing Taniguchi v. Kan Pacific Saipan, Ltd., 566 U.S. 560, 566, 132 S. Ct. 1997, 182 L. Ed. 2d 903 (2012)). He notes that ordinary meaning may be discerned by reference to dictionaries in use at the time of enactment of a statute. (*Id.*) (citing Delek US Holdings, Inc. v. United States, 32 F.4th 495, 498 (6th Cir. 2022)). *The Merriam-Webster New Collegiate Dictionary* (12th ed.) defines "recorded" as "to set down in writing; furnish written evidence of; [or] to cause **[*56]** (sound, visual images, data, etc.) to be registered on something...in reproducible form," and defines "message" as "a communication in writing, in speech, or by signals." Under these ordinary meanings, Dobronski says, a text message plainly constitutes a "recorded message."

In reply, Rocket notes that the MTCCCA speaks elsewhere about prohibiting communications that tie up a subscriber's telephone line. "Recorded commercial advertising that is authorized under this section must end or otherwise free the subscriber's telephone line for incoming and outgoing calls immediately upon the subscriber's termination of the call." M.C.L. § 484.125(8). This section speaks to otherwise authorized "calls," whereas neither the word call nor voice are used in M.C.L. § 484.125(2)(a). That section states, "[a] caller shall not use a telephone line to contact a subscriber at the subscriber's residence, business, or toll-free telephone number to . . . [d]eliver a recorded message for the purpose of presenting commercial advertising to the subscriber" without the subscriber's consent. The plain meaning of the statute encompasses text messages as well as voice calls.

Insofar as TCPA case law is relevant to the issue, numerous courts have held that **[*57]** a text message is a "call" under the TCPA as well. Noting that "call" is not defined in the TCPA, the Sixth Circuit has previously followed FCC guidance and found that a text message is a call under the Act. *See* Keating v. Peterson's Nelnet, LLC, 615 F. App'x 365, 370 (6th Cir. 2015) (citing *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. at 14115). Likewise, after Loper Bright freed the courts from binding agency determinations, at least three courts have found that the text and purpose of the TCPA support the interpretation that calls encompass text messages. *See* Pero v. Brown-Daub Chevrolet of Nazareth, No. CV 25-7016, 2026 U.S. Dist. LEXIS 134498, 2026 WL 1747214, at *5 (E.D. Pa. June 17, 2026) (citing cases).

Regardless, the issue is clearer under the language of the MTCCCA, which speaks to prohibitions on recorded messages, not specifically calls or voices. Text messages are therefore recorded messages under M.C.L. § 484.125(2)(a), and Dobronski's MTCCCA claim should not be dismissed as to call 22.

VII. Conclusion

For the reasons stated above, Rocket's motion for leave to file supplemental authority (ECF No. 18) is GRANTED. Further, the undersigned RECOMMENDS that Rocket's motion to compel arbitration (ECF No. 10) be DENIED WITHOUT PREJUDICE, that its first motion to dismiss the complaint (ECF No. 11) be DENIED AS MOOT, and that its second motion to dismiss the complaint (ECF No. 19) be GRANTED IN PART and DENIED IN PART. If these recommendations are adopted, Counts I, **[*58]** II, V, VI, and VII would be dismissed as to calls 1 through 20, but all other claims would remain.

Dated: July 15, 2026

Detroit, Michigan

/s/ Kimberly G. Altman

KIMBERLY G. ALTMAN

United States Magistrate Judge

---

**End of Document**